*469 Cuma ‘per
JohnsoN, J.
The fine imposed on the relator to restrain the collection of which was the object of this application, was for not making a return on oath of the slaves belonging to him and liable to work on the roads conformably to the acts of 1825, and whether the Commissioners had or had not partitioned out the roads of the parish amongst the several Commissioners, appears to me wholly immaterial to the questions arising out of it. I can well conceive that a knowledge of the number and residence of the hands liable to work on the road would be necessary to enable them to make an equitable and judicious partition, and for the same reason I incline to think that the advertisement signed by all the Commissioners (if the manner was legal) calling on the inhabitants to make returns of the number of their slaves liable to do road duty, would be a sufficient compliancewith the act; for the act expressly authorises the Commissioner of a particular section or district to require the returns to be made to such person at such place, and within such time as he shall appoint. He had then the authority to direct that it should be made to one of the Commissioners of the Parish and the notice is not. the less his act because the other Commissioners were joined with him, if indeed they had made partition of the roads, and the power over the section on which it is claimed the relator’s slaves were liable to work, had been assigned to an individual. The case then is resolved into the following propositions.
1st. Whether the slaves ot the relator whose houses are situated in St. John’s Parish were liable to do road duty in that Parish ?
2nd. Whether the notice published in the newspaper, calling on the inhabitants to make return of their slaves was sufficient to charge the relator ?
The Court being with the relator, has declined expressing any opinion on the first; but I cannot forbear to ex *470 press ray own conviction that the relator is entitled to hisr prohibition on the first ground also. The Parishes of St. John’s and St. James. Goose Creek, are separated by an ideal line, and from the facts stated, it appears that on running it out it is found that his dwelling house and a part of his negro houses are on the side of St. James’ and some of his negro houses are on the side of St. John’s, and it is said that his plantation on which his negroes are usually employed is on St. James’, and whether this is or is not the case,it will serve as an illustration. Now 1 agree that for very many purposes, unnecessary here to be mentioned, a mere ideal line will mark the residence of an inhabitant; but our slaves like other chattels are in legal contemplation attendant on the person of the owner, consequently his residence must be theirs. I do not intend to be understood as laying down this as a rule of universal application. Public policy and convenience would restrain it when it would operate injuriously to the public or the individual; but as applicable to the case under consideration, I am unable to perceive any evil or inconvenience.
The plantation of the relator is entire. His dwelling house, negro houses and plantation, constitute but one establishment, of which the dwelling house is the centre and himself the head, and his slaves are employed on the one side or the other of the line as his necessities may require; but the possession of, and property in the whole is concentered in him, and partake of his individual personal identity, and his residence must be regarded as the residence of the slaves so immediately attached to him.
The individual is not favoured by this conclusion, nor can I perceive that the public service will be prejudiced by it. He is bound to contribute to the public burthen in that parish in which he resides, and it is certainly a convenience -not only to him but to the superintending Commissioner that his hands should be kept together.
*471 2nd. On the second ground there is, I think, less doubt. The act of 1825 authorises the Commissioner to call on the inhabitants to make their returns and to designate the time when, and place where, and the person to whom it is to be made, and imposes a heavy penalty for the neglect — and the mode adopted was to publish a notice in the newspaper; but the act does not authorise this mode, and the rule clearly is that a newspaper notice is not sufficient, unless that mode is pointed out by the law. 1 Phil. Ev. 835. It is said, however, that this mode is sanctioned by long usage, but I am unable to discover the evidence of the fact, nor can I reconcile such a practice to sound reasoning or good policy, especially in those districts or parishes where there is no paper published. The effect would be to impose a penalty against which it would not always be possible to guard. If notice in one paper should be held sufficient, of course it must be so in another, and the inhabitants would be bound to watch in all the papers of the State, to learn what was their duty in amere neighbourhood concernment. This is unreasonable and cannot be allowed. The mode prescribed for summoning the inhabitants to work on the roads by a personal notice is convenient, safe and practical — and I can see no good reason why it should not be adopted in relation to the returns. It is, therefore, ordered and decreed that a prohibition do issue according to the prayer contained in the suggestion of the relator.

Petition granted.